State ex rel. v. Jacksonville Terminal Co. et al.—Syllabus

THE STATE OF FLORIDA *ex rel.* R. HUDSON BURR, NEW-
TON A. BLITCH AND ROYAL C. DUNN, AS RAILROAD
COMMISSIONERS OF THE STATE OF FLORIDA, *Relators,*
v. JACKSONVILLE TERMINAL COMPANY, ATLANTIC
COAST LINE RAILROAD COMPANY, FLORIDA EAST
COAST RAILWAY COMPANY, SEABOARD AIR LINE
RAILWAY, GEORGIA SOUTHERN & FLORIDA RAILWAY
COMPANY AND SOUTHERN RAILWAY COMPANY, *Re-
spondents.*

Opinion filed March 2, 1916

On petition for rehearing March 30, 1916.

1. A motion to quash an alternative writ of mandamus, like a
   demurrer to a declaration, admits as true all such matters
   of fact as are sufficiently pleaded.

2. The description contained in an order of the Railroad Com-
   missioners, of a tract of land upon which a Terminal Com-
   pany and certain railroad corporations were required to
   erect a terminal passenger station, does not show the ex-
   istence of a public street running through the tract by the
   use of the following words: bounded "on the north by a
   line running parallel with and two hundred feet north of
   the north line of Adams Street extended west from Myrtle
   Avenue to the aforesaid west line of the same tract."

3. An order made by the Railroad Commission prior to the
   Act of 1913, Chapter 6527, for which no power or authority
   existed in the Commissioners to make, is not affected by the
   provisions of such act declaring all presumptions to be in
   favor of every action of the Commissioners and all doubts
   as to their jurisdiction and powers to be resolved in their
   favor, when the latter act does not confer the power at-
   tempted to be exercised either expressly or by implication.
   In such case no basis exists upon which a doubt as to such
   power may rest and the provisions of the act therefore as
   to the construction of such an order do not apply.

4. Neither Section 2893 General Statutes of Florida, 1906, as it existed before the amendment by Chapter 6527 Laws of 1913, Section 2893 Compiled Laws of Florida, nor the latter act, Chapter 6527, confers upon the Railroad Commissioners any valid power to order a local Terminal Company engaged in the business of operating a Terminal Passenger Station, to erect a "new, better and larger" one on a different site for the depot accommodations of all railroads that may enter the city where it is located; nor have the Railroad Commissioners any power whatever under said statutes to order the Railroad Corporations renting and enjoying the facilities afforded by such Terminal Station to join with such Terminal Company in the erection of a new, better and larger terminal passenger station on a different site.

5. Subdivisions 5, 7 and 8 of Section 3 of Chapter 6527 Acts of 1913 amending Section 2893 of the General Statutes of Florida, 1906, prescribe specific and definite regulations applicable to separate and distinct classes of railroad depots and terminal stations, and clearly define the power of the Railroad Commissioners in regard thereto, and neither of said statutes afford any authority whatever for the attempted exercise of the power mentioned in the above head-note.

6. The authority delegated by the Legislature to the Railroad Commissioners by Section 2893 of the General Statutes of Florida, 1906, as amended by Chapter 6527 Laws of 1913, to compel two or more railroads entering a city or point to erect, operate and maintain a joint passenger terminal or Union Depot for their exclusive use as authorized by subdivision 8 of Section 3 of Chapter 6527, is different in theory and substance from the asserted power to compel two or more railroads entering the same town or city to erect a Terminal Passenger Station for their use and that of such other carriers as may desire to enter and pay a reasonable compensation for such facilities or the power to compel two or more railroads entering the same town or city to become joint owners of and co-partners with a Terminal Company in conducting such business and erecting such station.

7. By the provisions of Section 2892 General Statutes of Florida, 1906, the term "Common Carrier" is made to include companies operating terminal or union depots, but such section does not change nor in any degree alter the duties and obligations of such a company or corporation to the public, nor does it confer upon such a company the power of eminent domain.

8. As the Railroad Commissioners, who are statutory officers, can have and exercise no "jurisdiction" or "powers" except such as may be lawfully conferred upon them by the statutes of the State, an order made by the Railroad Commissioners cannot "be deemed and held to be within their jurisdiction and their powers," unless there is some basis in a statute for the exercise of the jurisdiction and power involved in making the order.

9. The statute provides that "all presumptions shall be in favor of every action of the" Railroad Commissioners, but a presumption in favor of action taken under an asserted delegated statutory power can arise only when some substantial basis of authority for the exercise of the power appears in a statute.

10. Though the statute enacts that "all doubts as to the jurisdiction and powers" of the Railroad Commissioners "shall be resolved in their favor," doubts cannot be resolved in favor of an asserted delegated statutory power when it is clear that there is no enactment that can be a basis for such asserted delegated power.

11. Where a general statute provides comprehensive regulations of common carriers and in distinct subdivisions enacts separate and specific regulations particularly affecting definite portions of the broad general subject of the statute, each such distinct subdivision of the statute, having had the discriminating attention of the lawmakers, must be regarded as expressing the precise legislative intent as to the nature and extent of the regulations of the particular matter therein treated.

12. Each one of the subdivisions 5, 7 and 8 of section 3, Chapter 6527, Acts of 1913, amending section 2893 of the General Statutes of 1906, provides specific and definite regulations applicable to separate and distinct classes of railroad depots.

13. The statutes do not confer upon the Railroad Commissioners any power that may fairly be regarded as authorizing the Commissioners to make an order requiring a local terminal company and the railroad companies that are its patrons jointly to change the location of the terminal company's depot or terminal, and such order cannot be construed to include a requirement that the railroad companies shall erect a joint terminal or union depot for their joint use, a depot of wholly different class under the statute as to which there has been no hearing or consideration, therefore, the order cannot be enforced as it is framed either in whole or in any part thereof.

Original proceedings in mandamus.

Alternative writ quashed.

Rehearing denied.

*Cockrell,* J., takes no part.

*D. C. McMullen,* for Relators;

*W. E. Kay, John E. Hartridge, John L. Doggett, W. A. Blount, · Fleming & Fleming, J. E. Hall, John C. Cooper & Son,* for Respondents.

ELLIS, J.—An alternative writ of mandamus was issued in this case requiring the respondents to obey certain orders made by the Railroad Commissioners requiring the construction of a new Union Depot at the City of Jacksonville.

It appears from the alternative writ that the Atlantic Coast Line Railroad Company, the Seaboard Air Line Railway and the Southern Railway Company are Virginia corporations, the Georgia Southern and Florida Railway Company is a Georgia corporation, and the Jacksonville Terminal Company and the Florida East Coast Railway Company are corporations organized under the laws of Florida; that the Jacksonville Terminal Company does business in the city of Jacksonville as "a common carrier and terminal company," and "owns and operates in the city of Jacksonville, Fla., a Union Passenger Depot or terminal station, which is now open to and used by all of the railroad companies aforesaid entering the city of Jacksonville, Fla.," and that its stock is owned by the above named railroad corporations. That all the railroad corporations named except the Southern Railway Company own and operate lines of railroad lying within the State of Florida and extending into the city of Jacksonville, that the Southern Railway Company transacts business in the State of Florida and enters the city of Jacksonville upon and over the tracks of the Atlantic Coast Line Railroad Company under a "lease or agreement of some character" between the two corporations.

In March, 1913, the Railroad Commissioners issued a notice to the above named corporations that on April 17, 1913, a meeting would be held in Jacksonville by the Railroad Commissioners "for the purpose of a hearing in the matter of requiring additional and better facilities in and about the said Union Passenger Depot, or a new and larger and better Union Depot, or better and larger depot facilities, and in case it should be found necessary to change the location of the said Union Depot, to determine what would be a fit and proper location for a

new Union Depot and to consider and determine any and all other questions which might arise in the premises."

That pursuant to the notice a meeting was held at which the respondents were represented, and at which there also appeared committees representing the city council and various trade organizations. Everyone was heard who desired to be heard, the testimony of many witnesses was taken, after which on the 21st day of June, 1913, the Railroad Commissioners made and entered the following order:

"*Order No. 400.*
*File No. 3460.*

*In the Matter of the Application of the Public Service Committee of the City of Jacksonville for an Order Requiring the Erection of a New Terminal Station in the City of Jacksonville.*

In pursuance of due and lawful notice previously given to the Atlantic Coast Line Railroad Company, the Florida East Coast Railway Company, the Seaboard Air Line Railway, the Georgia Southern & Florida Railway Company, the Southern Railway Company and the Jacksonville Terminal Company, the Railroad Commissioners of the State of Florida met on the 17th day of April, 1913, at 10 o'clock in the morning at the Board of Trade rooms in the City of Jacksonville to consider a certain resolution of the Public Service Committee of the City of Jacksonville requesting the said Commissioners to visit Jacksonville and hold a meeting for the purpose of investigating the alleged necessity for a new Terminal Station in the said city and to hear all who might desire to be heard in regard to the same and then and there to

determine whether or not they ought to make an Order requiring the carriers hereinbefore named to provide additional and better facilities in and about the union passenger depot in the city of Jacksonville or to provide a new and larger and better union depot, and at said meeting appeared the following: Mr. John E. Hartridge for the Jacksonville Terminal Company, Mr. Morton Riddle, General Superintendent of Atlantic Coast Line Railroad Company, Mr. J. C. Blanton, Manager Jacksonville Terminal Company, also the Public Service Committee of the city of Jacksonville, the Jacksonville Real Estate Exchange and the Jacksonville Board of Trade by various representatives, all of whom were fully heard and thereupon the said matter was taken under advisement, leave being granted to the parties in interest to file briefs;

And now on this day the said matter having been duly considered and the said parties having filed briefs, which have been considered, the said Railroad Commissioners do find that the present union passenger depot in the city of Jacksonville is inadequate to the needs of the city of Jacksonville and insufficient for the proper accommodation of the traveling public, and that a new, better and larger union passenger station ought to be erected in said city.

And they do further find that the carriers hereinbefore mentioned or one or more of them are the owners of all or the greater part of a certain tract of land situated in the city of Jacksonville, which is bounded as follows:

On the east by Myrtle Avenue, on the west by a line running parallel with Myrtle Avenue and eighteen hundred (1800) feet west thereof; on the south by the north line of Bay Street extended west from Myrtle Avenue to the aforesaid west line of the said tract and on the north

by a line running parallel with and two hundred (200) feet north of the north line of Adams Street extended west from Myrtle Avenue to the aforesaid west line of the said tract.

And the Commissioners do further find that the most feasible location for a union passenger depot in the city of Jacksonville is on the tract of land above described, and they do, therefore, order and adjudge that the carriers hereinbefore mentioned shall erect on the said tract of land a union passenger depot so located as to front on Myrtle Avenue and be adjacent thereto; said depot to be a double level station building of such capacity and with such conveniences as may hereafter be fixed by the said Commissioners, and to be provided and equipped with such car sheds, tracks, walks and approaches as the said Commissioners may hereafter require.

And it is further ordered that the said Commissioners shall be in session at their office in the city of Tallahassee on the 15th day of July, 1913, at 10 o'clock in the morning, for the purpose of considering upon what plans the said depot, sheds, and tracks ought to be constructed and what dimensions ought to be required and what conveniences ought to be required and to consider any and all other matters and questions not herein decided which may arise for consideration in the premises; and at such meeting all of the carriers above mentioned and all parties in interest will have an opportunity to be fully heard.

*Witness* the hand of the Chairman of the said Railroad Commissioners at their office in the city of Tallahassee, this 21st day of June, 1913."

On the 15th day of July, 1913, the Railroad Commissioners held a meeting in Jacksonville pursuant to the

terms of Order No. 400 above quoted for the purpose of considering upon what plans the new depot, sheds and tracks ought to be constructed and what dimensions and conveniences ought to be required. At this meeting the corporations interested moved a postponement of the further consideration of the matter until October 1, 1913, alleging in support of their motion that they had employed competent engineers to prepare ground plans for a station, and plans for the necessary tracks, and they were proceeding in good faith to carry out the said Order No. 400, but that it would be impossible to perfect the plans and submit them before October 1st, 1913, whereupon the further consideration of the matter was postponed to that date.

On the 25th day of September, 1913, the Jacksonville Terminal Company requested in writing a further postponement of the hearing to November 15, 1913. This written request of the Terminal Company set forth that the company recognized "the necessity for larger and better facilities" and that it had employed engineers to submit plans; that the magnitude of the work required a postponement of the matter to October 1st, at which time the company expected to be able to submit the plans, but finds that on account of the engineering difficulties, the large expenditure involved and the great work necessary to be done, the company would not be ready to submit the plans on that date. Afterwards on application of all the parties interested the matter was again postponed to November 17th, 1913.

On the last named date the Railroad Commissioners held a meeting at Jacksonville at which the above named corporations appeared by their representatives and submitted "drawings, plans and blue-prints of the said proposed Union Station, and also a yard and track plan in-

dicating a plan of improvement for the existing Union Station." The Jacksonville Terminal Company at the request of the Railroad Commissioners filed as information only an amended floor plan of the proposed station. After considering the plans, blue-prints, drawings and all evidence submitted the Railroad Commissioners on the 15th day of January, 1914, made and entered their "other certain order No. 428," which is as follows:

*"Order No. 428
File No. 3460.*
    *Before the Railroad Commissioners of the State of Florida.*

In the Matter of the Application of the Public Service Committee of the City of Jacksonville for an Order Requiring the Erection of a New Terminal Station in the City of Jacksonville.

In pursuance of Order No. 405, entered by the Railroad Commissioners of the State of Florida on the 26th day of July, 1913, this matter came on for further consideration on the 1st day of October, 1913, and upon motion of Mr. Morton Riddle, Chairman of the Board of Control of the Jacksonville Terminal Company, and representative of the railroad lines interested, further consideration of the said matter was postponed until the 15th day of November, 1913, and the said matter coming on for further consideration on said 15th day of November, 1913, the further hearing thereof was postponed to the 17th day of November, 1913, at two o'clock in the afternoon at the Board of Trade rooms in the City of Jacksonville.

    And on the said 17th day of November, 1913, this

matter coming on for further consideration, then and there appeared the following in support of the petition:

A Committee of the City Council of the City of Jacksonville, composed of Frank L Dancy, President, and Messrs. L. G. Hitchcock, S. L. Chapman and John W. DuBose, composing the Public Service Committee of the City Council;

A Committee of the Jacksonville Real Estate Exchange, composed of Arthur T. Williams, Chairman, Chas. A. Brown, Jr. and O. H. Hodgson;

A Committee of the Jacksonville Board of Trade, composed of Arthur T. Williams, Chairman, J. J. Logan and George M. Powell;

William Burbridge, a member of the Board of County Commissioners of Duval County, and other members of said Board;

Hon. Van C. Swearingen, Mayor of the City of Jacksonville, in behalf of the people of Jacksonville;

Also numerous other citizens; while

Mr. Morton Riddle, Chairman of the Board of Control of the Jacksonville Terminal Company, appeared as representative of the Jacksonville Terminal Company and of the railroad lines interested in the proposed station, and also Mr. J. C. Blanton, Manager of the Jacksonville Terminal Company.

And there also appeared Hon. A. H. King, in his own behalf, as a citizen of Jacksonville, who advocated the improvement of the existing union station.

And on the said day Mr. Morton Riddle, Chairman of the Board of Control of the Jacksonville Terminal Company, submitted drawings, plans and blue-prints of the said proposed station, as follows, to-wit:

A floor plan bearing the legend 'Jacksonville Ter-

minal Company, floor plan of proposed station, Jacksonville, Florida, November, 1913;'

A station and yard plan bearing the legend 'Jacksonville Terminal Company. Office of Chief Engineer. Proposed Station and Yard Improvement. General Lay-out Scheme. B-3. Jacksonville, Florida. Date: September, 1913.'

And a yard and track plan indicating a plan of improvement for the existing union station, bearing the legend 'Jacksonville Terminal Company. Proposed Station and Yard Improvement. Jacksonville, Florida, November, 1913.'

And thereupon, the said Railroad Commissioners, having heard all who desired to be heard, the said matter was taken under advisement.

And thereafter, on to-wit, the 15th day of December, 1913, the said Jacksonville Terminal Company, having at the request of the said Railroad Commissioners, filed, as information only, an amended floor plan of the said station, showing an enlargement of the waiting rooms on lines indicated by the said Railroad Commissioners, which amended floor plan bears the legend 'Jacksonville Terminal Company, Floor Plan of Proposed Station, Jacksonville, Fla., Dec. 15, 1913,' and the said Commissioners having considered all of the said plans, blue-prints and drawings, and also the plans, blue-prints and drawings filed with the Railroad Commissioners on to-wit the 17th day of April, 1913, suggesting improvements in the existing union station, and having considered all the evidence submitted;

Now on this day, this matter coming on for further and final consideration, and the said Railroad Commissioners being advised in the premises, do order and adjudge that the Jacksonville Terminal Company, the At-

lantic Coast Line Railway Company, the Seaboard Air Line Railway, the Florida East Coast Railway Company, the Georgia Southern & Florida Railway Company, and the Southern Railway Company, do proceed to erect on the tract of land described in Order No. 400, entered by the said Railroad Commissioners on the 21st day of June, 1913, a union passenger depot so located as to front on Myrtle Avenue and be adjacent thereto, and otherwise in accordance with the said Order No. 400. And it is hereby ordered and adjudged that the following requirements shall be fully complied with, to-wit:

The said depot shall be provided and equipped with adequate car sheds, tracks, walks and approaches, and the tracks shall be so arranged that no passenger shall be required to cross any track in approaching or departing from a train;

The said station building shall contain a waiting room for white passengers with not less than 11,860 square feet of floor space, with a ticket lobby with not less than 4,160 square feet of additional floor space, and a waiting room for colored passengers with not less than 5,624 square feet of floor space.

There shall also be provided adjacent to each waiting room, but occupying additional floor space, a smoking room for men and a rest room for women, and one toilet for each sex, each toilet to be so arranged that the entrance shall be approached through a smoking room or rest room, the smoking room for white passengers to contain at least 1,120 square feet of floor space, the rest room for white passengers to contain at least 979 square feet of floor space, the men's toilet room for white passengers to contain at least 1,078 square feet of floor space, the women's toilet room for white passengers to

contain at last 748 square feet of floor space, the smoking room for colored passengers to contain at least 396 square feet of floor space, the rest room for colored passengers to contain at least 396 square feet of floor space, and each of the toilets for colored passengers to contain at least 504 square feet of floor space. There shall be provided between the said waiting rooms and the train tracks a concourse to contain at least 19,800 square feet of floor space, with ample entrances from the said concourse to the ticket lobby and each of the waiting rooms, and there shall be provided for the use of passengers passing between the concourse and train tracks at least half as many train gates as there may be tracks.

And it is further ordered that the floor plan heretofore filed by Mr. Morton Riddle, Chairman of the Board of Control of the Jacksonville Terminal Company, and bearing the legend 'Jacksonville Terminal Company. Floor Plan of Proposed Station. Jacksonville, Fla., Dec. 15, 1913,' be and the same is hereby approved and accepted as a fit floor plan for the construction of the said depot. And it is further ordered that the yard plan filed with the said Railroad Commissioners on the 17th day of November, 1913, and bearing the legend 'Jacksonville Terminal Company. Office of Chief Engineer. Proposed Station and Yard Improvement. General Lay-out Scheme. B-3. Jacksonville, Fla., Date September, 1913' be and the same is hereby approved, accepted and designated as a fit and proper plan for the construction of yards and tracks in connection with the said union passenger depot.

And it is further ordered that the architect's plans and such other and further plans as may be required in the premises pertaining to the construction of the said union station, tracks, yards, etc., as specified in the sev-

eral orders of the said Commissioners pertaining thereto, shall be submitted for examination and approval to the said Railroad Commissioners on or before the 15th day of May, 1914, and that the work of constructing the said station and the said accessories shall be actually begun on or before the 15th day of July, 1915, and shall be thereafter prosecuted with all reasonable despatch and that this order shall be fully complied with on or before the 15th day of July, 1915.

Done and ordered by the Railroad Commissioners of the State of Florida, in session at their office in the City of Tallahassee, the Capital, this 15th day of January, A. D. 1914."

Thereafter the corporations filed with the Railroad Commissioners a petition for a "re-hearing and rescission" of Orders No. 400 and 428. In acting upon this petition the Railroad Commissioners granted a rehearing to consider "other and different yard plans in order to determine whether a better, more practicable or more economical yard plan could be adopted in connection with the construction of the Union Passenger Station required by said orders No. 400 and No. 428 and upon the location therein designated, and would thereafter adopt a better and more practicable and more economical plan if such could be found." A meeting was then called for the above purpose to be held at Tallahassee on November 10th, 1914. At this meeting the corporations through their representatives were heard, witnesses were examined and plans submitted all of which resulted in the following order being made by the Railroad Commissioners and numbered 462:

*"Order No. 462.*
*File No. 3460.*

*Before the Railroad Commissioners of the State of Florida.*

In the Matter of the Application of the Public Service Committee of the City of Jacksonville for an Order Requiring the Erection of a New Terminal Station in Said City.

In pursuance of their Order No. 459, made and entered the 9th day of October, 1914, the Railroad Commissioners of the State of Florida, being in session at their office in the City of Tallahassee, on the 10th day of November, 1914, then and there proceeded to the consideration of the matters designated and specified in the said Order No. 459, and then and there appeared the following: W. E. Kay, representing Jacksonville Terminal Company; J. B. Munson, President Jacksonville Terminal Company; F P. Fleming, representing Seaboard Air Line Railway; A. V. S. Smith, representing Florida East Coast Railway Company; George M. Powell, Chairman Board of Bond Trustees of the City of Jacksonville; F. L. Dancy, representing City Council of the City of Jacksonville; R. D. Drysdale, representing the County Commissioners of Duval County; W. L. Morse, Chief Engineer of the Jacksonville Terminal Company; J. B. Willoughby, Assistant Chief Engineer, Atlantic Coast Line Railroad Company; W. D. Faucette, Chief Engineer Seaboard Air Line Railway; E. Ben Carter, Superintendent Maintenance of Way, Florida East Coast Railway Company, and Frank P. Damon and J. W. Bushnell, Engineers of the Railroad Commissioners; but no further or other yard plans were presented by the said

Jacksonville Terminal Company, or any other interested carrier.

And the said hearing having been continued from day to day, was concluded on the 12th day of November, 1914, and thereupon the said Railroad Commissioners took the said matter under advisement.

And now on this day, the said matter coming on for further consideration, and the said Railroad Commissioners having considered all the evidence, and arguments submitted at the hearing, and the plans prepared by their Engineers, together with the evidence theretofore submitted, and being fully advised in the premises, do find that their Orders No. 400 and No. 428 ought to be enforced without further modification except as hereinafter set out; but the said Commissioners being of the opinion that a yard plan could be adopted to be used in connection with the union passenger depot described and designated by their Orders No. 400 and No. 428, which would be less expensive than the yard plan heretofore presented by the said carriers, which is described and approved in said Order No. 428, and identified by the legend, 'Jacksonville Terminal Company. Office of Chief Engineer. Proposed Station and Yard Improvement. General Lay-out Scheme. B-3. Jacksonville, Fla. Date: September, 1913,' and that the interested carriers ought to have the option to adopt any better or more practicable or less expensive plan which could be devised to meet the requirements of the said union passenger depot, it is, therefore, *Ordered* and *Adjudged* that the said Orders No. 400 and No. 428 shall be performed and enforced, except the following portion of the said Order No 428, which portion is hereby rescinded, to-wit, that portion of the said Order beginning with the words, 'And it is further ordered that the yard plan filed with the said

Railroad Commissioners on the 17th day of November, 1913' and ending with the words 'shall be fully complied with on or before the 15th day of July, 1915.'

And it is further ordered that the yards and tracks necessary to be used in connection with the said union passenger depot shall be constructed, except as otherwise provided herein, in accordance with the requirements of the said Orders No. 400 and No. 428 in such manner as to provide for the convenient and effective use of the said union passenger depot by the traveling public, and to that end the said yards and tracks shall be so arranged and operated as to require all passenger trains when receiving or discharging passengers at said station to stand with rear ends towards the concourse, so that passengers entraining and detraining will approach and depart by way of the rear ends of such trains, and said union passenger depot shall be so arranged and operated as to provide for the proper and efficient handling of the passenger traffic of the carriers using the said passenger depot upon such plans as will harmonize with the use of the floor plan adopted in and by the said Order No. 428 and bearing the legend 'Jacksonville Terminal Company. Floor Plan of Proposed Station. Jacksonville, Fla., Dec. 15, 1913,' and that in all other respects the said yards and tracks may be constructed upon such plans as the interested carriers shall deem proper and advisable.

And it is further ordered that the architect's completed building plans, and such other and further plans as may be required in the premises pertaining to the construction of the said union depot building, as specified in the said orders of the said Commissioners, shall be submitted to the said Commissioners for examination and approval on or before the 1st day of May, 1915, and thereafter the time for the commencement and comple-

tion of the work of constructing the said station will be fixed by the said Commissioners.

And it is further ordered that in case it should become necessary for the said carriers or either of them, in order to comply with this order and the said Orders No. 400 and No. 428, to acquire a right of way upon any public street or highway, the said carriers may make application to the said Commissioners for relief, and thereupon the said Commissioners will determine to what extent they will make the enforcement of the said orders conditioned upon the granting of such right of way, and that any and all other questions arising in connection with the performance and enforcement of said orders, or concerning the perfection or modification of plans, may be at any time submitted by the interested carriers to the said Commissioners for action on their part.

*Done and Ordered* by the Railroad Commissioners of the State of Florida, in session at their office in the City of Tallahassee, the Capital, this 12th day of December, A. D. 1914."

On May 7, 1915, the Railroad Commissioners gave notice that on the 17th day of May, 1915, they would be in session at Tallahassee, Florida, to consider and determine the date for the commencement and completion of the work of constructing a new terminal station in the city of Jacksonville, and on the last named date the Railroad Commissioners went into session for that purpose, at which the respondents were represented and gave notice that it was not their intention to comply with the orders theretofore made with respect to the erection of a new terminal station or Union Depot in the city of Jacksonville. After every one was given an opportunity to be heard who so desired, the Railroad Commissioners

took the matter under advisement and on the 18th day of May, 1915, made the following order, No. 485:

"*Order No. 485.*
*File No. 3460.*
    *Before the Railroad Commissioners of the State of Florida.*

In the Matter of the Application of the Public Service Committee of the City of Jacksonville for an Order Requiring the Erection of a New Terminal Station in the City of Jacksonville.

    In pursuance of Order No. 462 in the above matter, in and by which it was provided, among other things, that 'thereafter the time for the commencement and completion of the work of constructing the said station will be fixed by the said Commissioners,' the said Commissioners did on the 7th day of May, 1915, issue and serve their notice No. 77, and pursuant to said notice this matter came on for hearing before the Railroad Commissioners of the State of Florida at their office in the City of Tallahassee, on the 17th day of May, 1915, at three o'clock in the afternoon, and then and there appeared Jacksonville Terminal Company by W. E. Kay and John E. Hartridge, Counsel, J. B. Munson, President, and W. L. Morse, Chief Engineer; Seaboard Air Line Railway, by F. P. Fleming, Division Counsel; Atlantic Coast Line Railroad Company by W. E. Kay, Assistant General Counsel; Southern Railway Company by J. B. Munson, Georgia Southern & Florida Railway Company by J. B. Munson, and George M. Powell, representing the Jacksonville Chamber of Commerce.

    Whereupon, Colonel W. E. Kay, on behalf of all of the parties notified of the hearing and present thereat,

then and there stated in open session that they had nothing to say as to the time of commencement or completion of said work, as it was not their purpose or intention to comply with the orders heretofore made in this matter with respect to the erection of a new terminal station in the City of Jacksonville, Fla. Thereupon the Railroad Commissioners took the matter under advisement.

And now on this day, the said matter coming on for further and final consideration, and the Railroad Commissioners being fully advised in the premises,

It is *Considered, Ordered and Adjudged* that the work of constructing the said station and accessories, as provided for in former orders in this matter, shall be actually begun on or before the 15th day of November, 1915, and shall be thereafter prosecuted with all reasonable dispatch and that this order and all prior orders made in the premises shall be fully complied with on or before the 15th day of November, 1916.

*Done and Ordered* by the Railroad Commissioners of the State of Florida in session at their office in the City of Tallahassee, this 18th day of May, A. D. 1915."

It further appears from the Alternative Writ that all the above named corporations have disregarded and refused to obey Order No. 462, in that they have not submitted to the Railroad Commissioners for examination and approval the "Architect's completed building plans and said other and further plans as may be required in the premises pertaining to the construction of the said Union Depot building as specified in the said several orders," etc. That they have also disregarded and failed to obey Order No. 485 "in that they did not on or before the 15th day of November, 1915, begin the work of con-

structing the said station and accessories as provided for in former orders in the said matter," etc., and have each and all declared their purpose and intention to disregard and disobey the said Orders No. 400, No. 428, No. 462, and No. 485.

The command of the Alternative Writ was as follows:

*"Now Therefore, We,* being willing that full and speedy justice be done in the premises, do command you, the Jacksonville Terminal Company, the Atlantic Coast Line Railroad Company, the Florida East Coast Railway Company, the Seaboard Air Line Railway, the Georgia Southern & Florida Railway Company and the Southern Railway Company, and each of you, forthwith

To submit to the Railroad Commissioners of the State of Florida the architect's completed building plans, and such other and further plans as may be required in the premises pertaining to the construction of the said union depot building as specified in said Orders No. 400, No. 428, No. 462 and No. 485;

To prosecute to completion with reasonable diligence the work of constructing the said union depot, and accessories, as specified and set forth in said orders;

To provide and equip the said union depot with adequate car sheds, tracks, walks and approaches; and so arrange the tracks that no passenger shall be required to cross any track in approaching or departing from a train;

The union depot building shall contain a waiting room for white passengers with not less than 11,860 square feet of floor space with a ticket lobby with not less than 4,160 square feet of additional floor space, and

a waiting room for colored passengers with not less than 5,624 square feet of floor space; and also

To provide adjacent to each waiting room, but occupying additional floor space, a smoking room for men and a rest room for women, and one toilet for each sex, each toilet to be so arranged that the entrance shall be approached through a smoking room or rest room, the smoking room for white passengers to contain at least 1,120 square feet of floor space, the rest room for white passengers to contain at least 979 square feet of floor space, the men's toilet room for white passengers to contain at least 1,078 square feet of floor space, the women's toilet room for white passengers to contain at least 748 square feet of floor space, the smoking room for colored passengers to contain at least 396 square feet of floor space, the rest room for colored passengers to contain at least 396 square feet of floor space, and each of the toilets for colored passengers to contain at least 504 square feet of floor space. There shall be provided between the said waiting rooms and the train tracks a concourse to contain at least 19,800 square feet of floor space, with ample entrances from the said concourse to the ticket lobby and each of the waiting rooms, and there shall be provided for the use of passengers passing between the concourse and the train tracks at least half as many train gates as there may be tracks;

To construct the yards and tracks necessary to be used in connection with the said union passenger depot in accordance with the requirements of Orders No. 400 and No. 428, as modified by Order No. 462, in such manner as to provide for the convenient and effective use of the said union passenger depot by the traveling public, and so that the said yards and tracks shall require, by their construction, all passenger trains when receiving or

discharging passengers at said station to stand with rear ends towards the concourse, so that passengers entraining or detraining will approach and depart by way of the rear ends of such trains;

To locate the said station upon that certain tract of land situated in the City of Jacksonville, Florida, and bounded as follows: On the east by Myrtle Avenue, on the west by a line running parallel with Myrtle Avenue and eighteen hundred (1800) feet west thereof, on the south by the North line of Bay Street extended west from Myrtle Avenue to the aforesaid west line of the said tract, and on the north by a line running parallel with and two hundred (200) feet north of the north line of Adams Street extended west from Myrtle Avenue to the aforesaid west line of the said tract; said union depot to be so located as to front on Myrtle Avenue and be adjacent thereto;

And in all respects to comply with, observe and obey the said Orders No. 400. No. 428, No. 462 and No. 485, as above set forth.

Or that you appear before the Justices of this our Supreme Court sitting within and for the State of Florida, at the Court Room in the City of Tallahassee, on the 23rd day of December, 1915, at ten o'clock in the morning of that day, and show cause why you refuse so to do.

And have you then and there this writ.

*Witness the Honorable* R. F. Taylor, Chief Justice of the Supreme Court of the State of Florida, and the seal of the said Court, at Tallahassee, the Capital, this 23rd day of November, 1915.

G. T. WHITFIELD,

(Seal)    Clerk of the Supreme Court of the State of Florida."

To the Alternative Writ each one of the respondents interposed a motion to quash and set aside the writ.

These motions as argued orally and discussed in the joint brief for the respondents present to this court for its consideration and determination the following questions:

1st.   A misjoinder of parties respondent.   It is contended in behalf of the respondents that both the Southern Railway Company and the Jacksonville Terminal Company have been improperly joined as parties respondent, which if true as to either one the motion to quash should prevail.

2nd.   The Railroad Commissioners have no power to locate or re-locate a union depot.   The respondents contending that the statutes of Florida neither expressly nor impliedly confer upon the Railroad Commissioners the power to select sites upon which to erect union depots and require the railroad companies to erect them on the sites selected or after a union depot has been once erected and occupied to abandon the same and construct a new one upon a different site selected by the Railroad Commissioners.

3rd.   That the power attempted to be exercised by the Railroad Commissioners in making the orders named contravenes the declaration of rights in the State Constitution and the Fourteenth Amendment to the Constitution of the United States.   Therefore the statutes under which the power is sought to be exercised should not receive such construction as would seemingly vest in the Railroad Commissioners such power if any other construction consistent with the State and Federal Constitutions is possible.   That the power delegated by the Legislature to the Railroad Commissioners to require railroads to establish stations, designate the location and re-

quire the erection of passenger depots as the safety, convenience and comfort of passengers may require, and to require two or more railroads entering the same town, city or point to erect, operate and maintain a joint passenger terminal or union depot, may be exercised only in cases where the safety, convenience and comfort of passengers require or make necessary the exercise of the power. The question being not one of "feasibility," but "public necessity."

4th. That Order No. 400 shows upon its face that the findings of fact by the Railroad Commissioners did not authorize the exercise of the power granted by the Legislature because the power was attempted to be exercised by the Railroad Commissioners upon their finding first, that the present union depot was inadequate, and, second, that the new site, or one selected by the Railroad Commissioners was the more feasible one of the two upon which to erect the new depot. That the language of the order excludes the idea that there was any finding by the Railroad Commissioners that the site of the present union depot was an inadequate one upon which to erect a new depot, or that the erection of a new depot upon the designated site was necessary to the safety, convenience and comfort of the passengers.

5th. That the mandatory part of the writ is indefinite and uncertain in that it commands the erection of a building the details of the construction of which are to be left to subsequent action of the relators.

6th. That the writ fails to show a clear prima facie case in the relators, and

7th. That it requires respondents to appropriate a public street of the city of Jacksonville and attempt to compel the violation of a criminal statute.

Construing the language of the alternative writ ac-

cording to the rules of construction as applied to other proceedings at law, certain facts may be considered as admitted by all parties. State *ex rel.* Fowler v. Finley, 30 Fla. 302, 11 South. Rep. 500; Scott v. State *ex rel.* Grothe, 43 Fla. 396, 31 South. Rep. 244; State *ex rel.,* Railroad Com'rs v. Atlantic Coast Line R. Co., 67 Fla. 441, 63 South. Rep. 729; Merchants Broom Co. v. Butler, 70 Fla. 397, 70 South. Rep. 383. Four of the railroad corporations named in the writ, the Atlantic Coast Line Railroad Company; the Seaboard Air Line Railway; the Georgia Southern & Florida Railway Company, and the Florida East Coast Railway Company each own and operate and for many years past have owned and operated lines of railroad lying within the State of Florida and extending into the city of Jacksonville; the Southern Railway Company does not own and operate any lines of railroad lying within the State, but it does transact business in Florida and enters the city of Jacksonville upon and over the tracks of the Atlantic Coast Line Railroad Company under a lease or agreement of some character between the two corporations; the Jacksonville Terminal Company is not a railroad corporation, but a corporation which owns and operates in the City of Jacksonville a union passenger depot or terminal station, which is open to and used by the other railroad corporations; that the Railroad Commissioners pursuant to notice held a meeting at Jacksonville and heard all who desired to be heard and took the testimony of witnesses upon the following subjects: First, the matter of requiring additional and better facilities in and about the union passenger depot owned and operated by the Jacksonville Terminal Company; second, whether a new, larger and better union depot should be required, or better and larger depot facilities; third, the necessity for

21

changing the location of the union depot owned and operated by the Jacksonville Terminal Company, and if such change of location was found to be necessary, what location would be fit and proper for a new union depot; that Order No. 400 contains a recital of the findings by the Railroad Commissioners which are made the basis of their action, and those findings are: First, that the present union passenger depot in the city of Jacksonville is inadequate to the needs of the City of Jacksonville and insufficient for the proper accommodation of the traveling public; second, that a new, better and larger union passenger station ought to be erected in said city; third, that at least one of the respondents is the owner of a part of the tract of land described in the order; fourth, that the tract of land described is the most feasible location for a union passenger depot in the city of Jacksonville.

We think that the language employed in Order No. 400 to describe the tract of land upon which the new depot was ordered to be built, does not convey the idea insisted upon by counsel for the respondents; that Adams Street is an existing public highway or street of the city of Jacksonville actually traversing the tract of land described. The language, "Adams Street extended west from Myrtle Avenue to the aforesaid west line of the said tract," does not assert or affirm Adams Street to be an existing highway or street actually extending across the tract of land, because it is not the function of the past participle to give affirmation or assertion. Webster's Dict. It is true that a participle may denote an attribute as counsel insists, but it is also true that as it partakes of the nature of an adjective it may limit, define, specifiy or describe a thing. The word "extended" was used to define or describe Adams Street as one terminating at Myrtle Avenue but drawn out to the west line of the

tract for purposes of description. "The word 'extended' implies something to be extended." Wisconsin Cent. R. Co. v. Comstock, 71 Wis. 88, 36 N. W. Rep. 843. Nor do we think that any map is a necessary part of the description. A surveyor could easily locate the northern line of the tract by projecting the north line of Adams Street where it ends at Myrtle Avenue, westward eighteen hundred feet plus the width of Myrtle Avenue. To extend a street means its prolongation in the direction to which it already points, and does not authorize its deflection in order to reach a given point. Mayor and City Council of Monroe v. Police Jury of Ouachita Parish, 47 La. Ann. 1061, 17 South. Rep. 498. The land described in Order No. 400 as the site for the new depot is not the same tract as that on which the union depot of the Jacksonville Terminal Company now stands.

The question of the power of the Railroad Commissioners under the foregoing facts to require by valid order the respondents to unite in the acquisition of the described property and erect thereon a new union passenger depot involves: First, the question of power in the Railroad Commissioners to compel a terminal company and one or more railroad corporations to jointly erect and maintain a union passenger depot or terminal station; such a union passenger depot or terminal station as was and now is conducted and operated by the Jacksonville Terminal Company and considered by this court in the case of State *ex rel.* Attorney General v. Jacksonville Terminal Co., 41 Fla. 377, 27 South. Rep. 225, and made the special subject of Subdivision 7 of Section 3 of Chapter 6527, Laws of Florida 1913, and as distinguished from "Depots" which are made the special subject of Subdivision 5 of that Section or the "Joint ter-

mianl or Union Depots" which are made the subject of Subdivision 8 of the same section of the act.

Secondly, there is involved the question of power in the Commissioners to select and designate a site for the location of such a union passenger or terminal station.

The question has never been determined by this court. If the power first above defined does not exist in the Railroad Commissioners it follows that the second does not, and the motions to quash should be granted; but if the power first defined is found to exist in the Commissioners, it does not follow that the second is also vested in them, and if that power should be found not to be possessed by them, the writ must fail.

There should be borne in mind what this court has said anent the powers, authorities and duties of the Railroad Commissioners in construing the statute whence those powers, authorities and duties are derived, and in the light of those and other decisions of this court we should determine the questions presented.

This court has said in many cases, that the powers, duties and authority of the Railroad Commissioners are those and only those that are conferred expressly or impliedly by statute of the State. See State *ex rel.*, Railroad Com'rs v. Southern Tel. & Const. Co., 65 Fla. 270, 61 South. Rep. 506; State *ex rel.*, Railroad Com'rs v. Atlantic Coast Line R. Co., 60 Fla. 465, 54 South. Rep. 394; State *ex rel.*, Ellis v. Atlantic Coast Line R. Co., 51 Fla. 578, 40 South. Rep. 875; State v. Atlantic Coast Line R. Co., 56 Fla. 617, 47 South. Rep. 969. In the latter case it was said: "The Railroad Commissioners are statutory officers whose powers are special and limited. They can exercise only such authority as is legally conferred by express provisions of law, or such as is by fair implication and intendment incident to and included

in the authority expressly conferred for the purpose of carrying out and accomplishing the purpose for which the officers were established;" also "If there is a reasonable doubt as to the lawful existence of a particular power that is being exercised by the Commissioners the further exercise of the power should be arrested." The above case was cited and the language quoted in State *ex rel.,* Railroad Com'rs v. Louisville & N. R. Co., 57 Fla. 526, 49 South. Rep. 39, in which the court said the "reasonable doubt should be resolved against their exercise of such power."

Those portions of the statute vesting the power in the Railroad Commissioners to compel railroad companies to establish stations, erect depots, and to deal with terminal companies are as follows: .

Section 2893 General Statutes of Florida, 1906, as amended by Chapter 6527 Laws of 1913, Section 2893 Compiled Laws of Florida. "And they shall have power:

5. To require the establishment of stations, including flag stations, at which trains may be required to stop, and the establishment of landings and wharves at which water carriers may be required to stop; to designate the location and require the erection of such freight and passenger depots, houses, platforms and wharves with all necessary conveniences as the safety, convenience and comfort of passengers and the proper handling, care, protection and prompt delivery and transportation of freight may require; to supervise, regulate and control all stations, depots, platforms, houses and wharves and to require a sufficient force of employees to be maintained therein and thereat to conduct in a proper manner the business of the carriers.

7. To regulate, supervise and control all passenger,

terminal or union depot companies, whether owned or operated by any railroad in connection with its main line or by separate company organized for that purpose and to require the admission into such union depot or terminal by the owner, lessee or operator thereof of any railroad company or companies which may desire to enter such terminal or union depot or which may be required to do so by order of the said commissioners and to compel the person or company operating said depot or terminal to furnish to the railroad entering the same fair and equal participation in all the rights, privileges, connections, interchanges of traffic and other benefits of said depot or terminal and to prescribe and enforce just and reasonable rates for the uses of such terminals or depots and the privileges thereof.

8.    To require two or more of the railroads entering the same town, city or point, to erect, operate and maintain a joint passenger or freight or a joint passenger and freight terminal or union depot and to provide for the interchange of traffic between said railroads."

The three above quoted subdivisions of the statute, deal with three distinct and separate types or classes of passenger depots. Subdivision 5 deals with depots which a single railroad may be required to erect at such stations along its line as may be deemed necessary for the safety, convenience and comfort of the passengers traveling over such railroad. Such a class of depots this court dealt with in the following cases: College Arms Hotel Co. v. Atlantic Coast Line R. Co., 61 Fla. 550, 54 South. Rep. 459; Louisville & N. R. Co. v. Railroad Com'rs, 63 Fla. 491, 58 South. Rep. 543; State ex rel., Railroad Com'rs v. Florida East Coast Ry. Co., 69 Fla. 165, 67 South. Rep. 906.

Subdivision 8 deals with *"joint passenger terminal*

or *union depots."* A terminal station or union depot
which the Railroad Commissioners may require two or
more railroads entering the same town, city or point to
erect, operate and maintain jointly for their own exclu-
sive use. Such a depot however would in no sense be a
"Union Passenger Depot" which any other railroad that
might later enter the same city, town or point could use
and occupy under the authority of Chapter 4700 Laws
of 1899 as amended by Chapter 6527 Laws of 1913.
The class or type of depots dealt with by this subdivision
was considered by this court in the case of State *ex rel.*
Railroad Com'rs v. Atlantic Coast Line R. Co. and Sea-
board Air Line R. Co. and Seaboard Air Line Ry. Co.
67 Fla. 441, 63 South. Rep. 729. In that case the Order
of the Railroad Commissioners which was directed to
the two railroads entering the "Town of Bartow" re-
quired them to "erect a *joint passenger station"* in the
said town of Bartow. It would not be contended that
any other railroad that might subsequently enter the
town of Bartow would have the right of admission into
that depot and equal participation in all the rights, priv-
ileges, connections and benefits as the Atlantic Coast
Line Railway Company and the Seaboard Air Line Rail-
way Company, simply upon the payment to those two
companies of reasonable charges for such use and priv-
ileges. The Railroad Commissioners would have no
power to require it to be done. They might proceed
against the three railroads requiring them to operate and
maintain the depot as a joint depot, but in such case the
interest or share obtained therein by the new railroad
would have to be acquired by purchase or condemnation
by eminent domain. The case of Railroad Commission
of Alabama v. Alabama Great Southern R. Co., 135 Ala.
354, 64 South. Rep. 13, cited by counsel for relators was

one in which the court had before it an order of the Railroad Commission of Alabama, directed against several railroad corporations and the receiver of one other directing them to "proceed to the procurement of sufficient grounds within the boundaries above set forth (certain specified territory within the city of Bessemer) and proceed with the construction of an adequate passenger station thereon, to be used *jointly* by the above set out railroad companies," etc. Here was nothing more than the character of depot contemplated by Subdivision 8 and considered by this court in the Bartow case.

Now Subdivision 7 has no reference to a depot or terminal station owned and used by a single railroad company, or jointly by two or more railroad companies for its or their own traffic, but it deals with those passenger terminals or union depots which are owned and operated by a terminal company, or by individuals or by a railroad company in connection with its main line, when such terminal company, individual or railroad company undertakes the public business of furnishing terminal facilities generally to railroad common carriers. Such a terminal or union passenger depot was considered by this court in the case of State *ex rel.* Attorney General v. Jacksonville Terminal Company, 41 Fla. 377, 27 South. Rep. 225, in which the court speaking through Mr. Justice CARTER construing that part of Section 6 of Chapter 4700 which became and now is verbatim Subdivision 7 of Section 3 of Chapter 6527 Laws of 1913, used substantially the above language. In that case the clear distinction was drawn between such a station or depot and those contemplated by subdivisions 5 and 8. The court said: "We do not mean to say that the Commissioners are given no powers over terminal stations owned and used by a railroad company exclusively for its own traf-

fic, for they have certain powers relating thereto derived
from other provisions of the statute, and because such
terminals are part and parcel of the main line over which
certain powers are given, but as to such terminals the
Commissioners have no authority to require the admis-
sion of another company and fix the rate of compensa-
tion therefor."

Now the orders of the Railroad Commissioners
which the Alternative Writ of Mandamus in this case re-
quires the respondents to obey, command the respond-
ents including the Jacksonville Terminal Company to
erect a union passenger depot. This is to be done and
the structure when completed is to be used in place of
the "present union passenger depot in the city of Jack-
sonville" which is owned and operated by the Jackson-
ville Terminal Company, a separate entity from the rail-
road corporations named, and which undertook to fur-
nish terminal facilities to and permitted the use of such
terminal and its privileges by the railroad common car-
riers entering the city, and because the present union pas-
senger depot is insufficient for the proper accommoda-
tion of the traveling public. So a "new, better and
larger union passenger station" was required to be erect-
ed in said city. Not a joint union depot or terminal to
be owned, used and occupied by the railroad corpora-
tions named, and none others, in which case the Jackson-
ville Terminal Company would have been not only an
unnecessary, but improper party; but a passenger ter-
minal or union depot to be owned and operated to fur-
nish terminal facilities not alone to the respondents who
are railroad common carriers, but to any other railroad
corporations whose line may hereafter enter the city.
The railroad corporations named in the orders were re-
quired to become partners and joint owners of the ter-

minal or union depot with the Jacksonville Terminal Company. The effect of which would force them into the business of operating a terminal company in connection with their own lines and furnishing terminal facilities to other railroad common carriers that may enter the city and desire terminal facilities at this station. A business which a railroad corporation may enter into in the discretion of its board of directors, but not such a business as it can be compelled to enter into upon the theory that it is a duty which it owes the public.

It is apparent that Order No. 400 and the subsequent ones mentioned in the writ, can reasonably bear no other construction. The first question considered by the Commissioners was the adequacy and sufficiency of the "present Union Passenger Depot," a depot owned by the Jacksonville Terminal Company and of the character described by Subdivision 7 and considered by this court in the case mentioned, State *ex rel.* Attorney General v. Jacksonville Terminal Company. This depot having been found to be inadequate and insufficient, the Jacksonville Terminal Company was ordered to erect a "new, better and larger" one and in this enterprise the railroad corporations were required to join and become part owners. That it was to be a "joint terminal or union depot" such as contemplated by Subdivision 8 there is nothing in the orders to indicate but the mere joining of the railroad corporations the significance of which if any was completely destroyed by making the terminal company the owner of the present depot, a party.

We find no authority in the Railroad Commissioners whatsoever to compel a terminal company which is engaged in the business of operating a terminal station which it owns and undertaking to furnish to railroads entering the city or town where the terminal is located,

terminal facilities, connections and benefits, to erect a new, better and larger one.   There is authority to compel the *railroads* entering the city to erect, operate and maintain a joint passenger terminal or union depot, even though the effect of such order would be to require the railroads using the present terminal depot to withdraw from it:   Nor is there any power vested in the Railroad Commissioners to compel two or more railroads entering the town or city to erect a union passenger depot of the character of such depots as is contemplated by subdivision 7 and thus force upon them a business which they are not required by their obligations to the public to enter into; nor is there any power in the Commissioners to compel such railroads  to be joint owners with a terminal company in such property and co-partners in such business.   A terminal company owning or operating terminals or union depots for the purpose of receiving, delivering and transferring passenger traffic to and from the place or city in which the terminal or union depot may be situated, etc., is defined by the act as a "Common Carrier" but that definition does not change nor in any degree alter the duties and obligations of such a corporation to the public, nor does it confer upon such company the power of eminent domain.   The delegation of such power must plainly appear.   2 Lewis' Sutherland Stat. Const. (2nd ed.) §559; 10 R. C. L. p. 196.

From the views expressed herein it follows that the motions to quash should be granted.   The alternative writ is quashed and the petition dismissed.

Taylor, C. J., and Shackleford, J., concur.

Cockrell, J., takes no part.

Whitfield, J., absent by reason of illness.

WHITFIELD, J. (*On petition for rehearing*)—The relators have filed a petition for a rehearing herein on the following grounds:

"First.    Because the decision in this case, insofar as it holds that a doubt as to the exercise of a power by the Railroad Commissioners should be resolved against their exercise of such power, is in conflict with Subdivision 13 of Section 2893 of the General Statutes of Florida, as amended by Act of the Legislature of 1913, which directs that 'all presumptions shall be in favor of every action of the Commissioners, and all doubt as to their jurisdiction and powers shall be resolved in their favor.'

"Second.    Because the decision disregards and conflicts with the legislative will in prescribing a rule of construction for the guidance of courts in dealing with the powers of the Railroad Commissioners as set forth in Chapter 6527 of the Laws of Florida, Acts of 1913.

"Third.    Because the decision admits the power of the Railroad Commissioners 'to compel the railroads entering the city to erect, operate and maintain a joint passenger terminal or union depot,' but denies relief because the Jacksonville Terminal Company is joined in the orders, thereby overlooking or disregarding that part of Chapter 6527 of the Laws of Florida which provides that when any part of an order made by the Railroad Commissioners is found invalid 'the Court shall proceed to enforce such portion thereof as may be valid.' "

A discussion of the statutory provisions referred to in the petition for rehearing was not necessary to a determination of the questions presented on the motions to quash the alternative writ.    The quotation in the main opinion taken from previous opinions of this court relative to doubts as to the existence of power in the Rail-

road Commissioners merely indicated the rule in force and unaffected by statute when the first order herein, No. 400, was made June 21, 1913, the quoted statute having under Section 18, Article III of the Constitution taken effect in August, 1913, sixty days from the final adjournment of the session of the legislature at which it was enacted.

Subdivision 13 of Section 3, Chapter 6527, Acts of 1913, amending Section 2893 General Statutes of 1906, provides that "Every rule, regulation, schedule or order heretofore or hereafter made by the Commissioners shall be deemed and held to be within their jurisdiction and their powers, and to be reasonable and just and such as ought to have been made in the premises and to have been properly made and arrived at in due form of procedure and such as can and ought to be executed unless the contrary plainly appears on the face thereof or be made to appear by clear and satisfactory evidence, and shall not be set aside or held invalid unless the contrary so appears. All presumptions shall be in favor of every action of the Commissioners and all doubts as to their jurisdiction and powers shall be resolved in their favor, it being intended that the laws relative to the Railroad Commissioners shall be deemed remedial laws to be construed liberally to further the legislative intent to regulate and control public carriers in the public interest. If in any proceeding to enforce any rule, regulation, schedule or order any part thereof shall be found invalid, the Court shall proceed to enforce such portion thereof as may be valid if the same can be done." Sec. 2893 Compiled Laws of 1914.

As the Railroad Commissioners, who are statutory officers, can have and exercise no "jurisdiction" or "powers" except such as may be lawfully conferred upon

them by the statutes of the State, an order made by the Railroad Commissioners can not "be deemed and held to be within their jurisdiction and their powers," unless there is some basis in the statute for the exercise of the jurisdiction and power involved in making the order. The statutory provisions which it is claimed give to the Commissioners authority for making an order, may be regarded as being in law a part of the order; and if the statute does not in reality confer the authority asserted by the order, the absence of authority and the consequent invalidity of the order in effect "plainly appears on the face" of the order within the meaning of the quoted statutory provision.

A presumption in favor of action taken under an asserted delegated statutory power can arise only when some substantial basis of authority for the exercise of the power appears in a statute. Doubts cannot be resolved in favor of a delegated statutory power when there is no enactment that can be a basis for such asserted delegated power.

If there is no statutory provision that may by its terms or by any fair intendment be regarded as affording a basis for the authority asserted by the Railroad Commissioners in making the order here sought to be enforced, the above quoted provisions of the statute as to the existence of jurisdiction and powers and as to indulging presumptions and resolving doubts in favor of action taken by the Railroad Commissioners, can have no application in this case; and the effect of the statute in other cases that may arise can not properly be anticipated here.

The statute relied on by the relators as conferring the powers here controverted is Chapter 6527, Acts of 1913, amending Section 2893 and other sections of the General

Statutes of 1906. This is a general statute providing comprehensive regulations of common carriers; and in distinct subdivisions enacts separate and specific regulations particularly affecting definite portions of the broad general subject of the statute. Each such distinct subdivision of the statute having had the discriminating attention of the lawmakers, must be regarded as expressing the precise legislative intent as to the particular matter therein treated. Otherwise, the manifest purpose to make separate specific regulations of particular matters contained in the general subject would, in a measure at least, be frustrated. In amending Section 2893 General Statutes by Section 3 Chapter 6527, the regulations were separated into distinct subdivisions consecutively numbered each relating to à definite portion of the general subject of the statute, thus showing a purpose to deal separately with several classes of depots, as elucidated in the main opinion, *viz,* stations and depots on lines of railroad, union depots or terminals and joint terminals or union depots, and to express in each subdivision the ultimate legislative intent as to the regulation of the matter covered by such subdivision. Subdivisions 5 and 8 of Section 3, Chapter 6527, Acts of 1913, provide regulations that are appropriate only to railroads being operated from point to point and to stations and depots on the lines of such railroads. Subdivision 7 in specific terms provides regulations that are appropriate only to terminal or union depot companies or other companies operating local terminal or union depots, for the accommodation of railroads entering such local point.

Subdivision 5 of Section 3, Chapter 6527, confers upon the Railroad Commissioners power "to require the *establishment* of *stations,* including flag stations, at which trains may be required to stop * * * ; to *designate*

the *location* and require the *erection* of such passenger *depots* * * * as the safety, convenience and comfort of pasesngers * * * may require; to supervise, regulate and control all *stations, depots,* etc., and to require a sufficient force of employees to be maintained therein." This subdivision clearly relates to *stations* and *depots* upon lines of railroads; and the authority therein given to *designate* the *location* and to require the *erection* of *depots,* and to supervise, regulate and control all *stations, depots,* etc., is obviously given to supplement and make effective the power to require the *establishment* of *stations* upon lines of railroads. Such provisions have and manifestly were intended to have no relation whatever to passenger terminal or union depots operated at one local point by a terminal company for the use of railroad companies, its patrons. If this were not the legislative intent, the enactment of subdivision 7 would have been unnecessary. Subdivision 5 affords no basis of authority for the order made in this case.

Regulations of union depots or terminals are specifically prescribed in subdivision 7, showing a legislative intent to make separate and specific and particularly appropriate regulations as to union depots and terminals; and these particular provisions must be regarded as expressing the precise and definite legislative intent as to the nature and extent of the regulations designed for such union depots or terminals. These provisions extend only to the regulation, supervision and control, and to the admission of railroad companies and their rights in the use of union depots or terminals.

Subdivision 8 relates specifically and only to such joint terminal or union depots that two or more railroads entering the same town, city or point, may be required to erect, operate and maintain, and to provide "for the

interchange of traffic between said railroads." Subdivisions 7 and 8 plainly do not give or purport to give to the Railroad Commissioners any semblance of authority to require a terminal company, or two or more railroad companies jointly or conjointly with a terminal company, to change the location of a union depot or terminal that is owned and operated only at a local terminal point by the terminal company for the use of railroad companies, its patrons. No other statute is referred to as conferring the power to make the order involved here.

As there is no basis of authority in the statutes for the order sought to be enforced, such order cannot lawfully "be deemed and held to be within their jurisdiction and their powers," and there is nothing from which a presumption in favor of the order may arise; and as nothing in the nature of the power asserted by the order has been conferred, there is no basis for a doubt to be resolved in favor of such a power. There being no statute giving in plain or in ambiguous or uncertain terms the power to make the order here sought to be enforced, there is nothing in this case  upon which the above quoted provision of the statute as to presumptions and doubts in favor of authority to make the order may operate.

The purpose of the order is to require the respondents, a terminal company and several railroad companies, conjointly to establish a passenger terminal station and to erect thereon a union passenger depot at a point wholly apart and some distance from the one now owned and operated solely as a local union depot or terminal by the terminal company alone, for the convenience of the railroad companies, its patrons. The hearings, proceedings and orders herein by the Railroad Commissioners do not contemplate, cover or include the erection of a joint ter-

minal or union depot by the respondent railroad companies under subdivision 8 of section 3 of the statute.

As the Railroad Commissioners have been given no power to require a local terminal company to change the location of its depot or terminal, or power to require the railroad companies that by agreement use the facilities of the terminal company, either jointly or conjointly with the terminal company, to change the location of the terminal company's union depot or terminal, and as no part of the order can be construed to require only the respondent railroad companies to erect a joint terminal or union depot for themselves, the entire order and every part thereof is invalid, and the court cannot lawfully enforce any part of it; therefore the provision of the statute as to the enforcement of such portions of orders "as may be valid if the same can be done" has no application in this case.

Rehearing denied.

TAYLOR, C. J. and SHACKLEFORD and ELLIS, JJ. concur.

COCKRELL, J. takes no part.